IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

DEC 1 4 2020

CLERK, U.S. DISTRICT COURT
By_____
          Deputy

| | | |
|---|---|---|
| FARHAN AWAN, | § | |
| | § | |
| Applicant, | § | |
| | § | |
| v. | § | No. 4:20-CV-135-A |
| | § | |
| BOBBY LUMPKIN, Director,[1] | § | |
| Texas Department of Criminal | § | |
| Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

**MEMORANDUM OPINION**
**and**
**ORDER**

This is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by applicant, Farhan Awan, a state prisoner confined in the Correctional Institutions Division of the Texas Department of Criminal Justice (TDCJ), against Bobby Lumpkin, director of that division, respondent. After having considered the pleadings, state court records, and relief sought by applicant, the court has concluded that the petition should be denied.

**I. FACTUAL AND PROCEDURAL HISTORY**

In September 2016 a jury in Tarrant County, Texas, Case No. 1434446D, found applicant guilty of continuous sexual abuse of A.B., a child under the age of 14 and he was sentenced to 35

---

[1]Bobby Lumpkin has replaced Lorie Davis as the director of the Correctional Institutions Division of the Texas Department of Criminal Justice and is automatically substituted as the party respondent. FED. R. CIV. P. 25(d).

years confinement. (Clerk's R. 108, doc. 23-3.) Applicant's
conviction was affirmed on appeal and the Texas Court of Criminal
Appeals refused his petition for discretionary review. (Docket
Sheet 2, doc. 23-2.) Applicant also sought post-conviction state
habeas-corpus relief, to no avail. (SHR[2] & Action Taken, docs.
23-23 & 23-24.)

The state appellate court provided the following background
of the case:

### I. [Applicant]'s abuse of A.B.

In 2003, five-year-old A.B. emigrated from
Pakistan to Bedford, Texas, with her recently-married
Mother, her Stepfather, and her Stepfather's two older
children—Stepbrother and Stepsister. They moved into a
small, two-bedroom apartment in Bedford and soon after
the move, Mother gave birth to another son, Brother.

#### A.   The abuse began shortly after [Applicant] moved into A.B.'s apartment.

In December 2007, A.B. was 10 years old when her
Stepfather's brother (Uncle) and his son, [Applicant],
also emigrated from Pakistan and moved into the small
Bedford apartment with her family. The addition of two
more residents in the apartment created crowded
conditions. Mother, Stepfather, A.B., and Brother slept
in one bedroom where Mother and Brother shared a bed,
A.B. slept on a "fold-away" bed, and Stepfather slept
on the floor. [Applicant], who was in his early 20s,
shared the second bedroom with Stepbrother, while Uncle
slept in the living room on a couch.

When [Applicant] arrived in Bedford, the family
trusted him. He was thought to be very religious,
responsible, and trustworthy, and he was the go-to
person for help with any technological issues. But

_____

[2] "SHR" refers to the record of applicant's state habeas proceeding in
WR-89,867-02.

shortly after his arrival, [Applicant] became inappropriately affectionate toward A.B. At trial, A.B. testified that it began when [Applicant] invited her to play a video game with him. Playing the video game led to a game of keep-away with an orange foam ball. According to A.B., whenever she had the ball, [Applicant] would wrap himself around her as if to grab the ball but would actually grab her breasts and vagina over her clothes instead. A.B. testified that she knew his touching was inappropriate, and she told him to stop. But while [Applicant] promised to stop, he continued touching her inappropriately whenever they played the game. And A.B. testified that they played every night for a few weeks.

Eventually, things progressed further. One night while A.B. was sitting in [Applicant]'s lap on the living room couch watching TV, he touched her breast underneath her shirt. A.B. testified that, although she knew the touching was inappropriate and it scared her, she did not think she could stop him.

Undeterred, [Applicant] began touching A.B. more often. A.B. recounted for the jury how, after school or at night, [Applicant] would reach under her clothes and touch her genital area while she sat in his lap in front of the computer—a computer he used to show her pornographic websites and videos. A.B. estimated that [Applicant] touched her in this manner at least 10 to 15 times while he was living in the family apartment.

[Applicant] became bolder with his abuse, too. A.B. testified, "There were several times where he would make me like bend over the couch and he would like dry hump me from behind. He would just grab me in random places like around the apartment."

Although Mother was not employed outside the home and was present when these abusive acts occurred, she was usually out of sight in the kitchen. Mother and A.B. testified that, consequently, Mother was unaware of what was taking place. [Applicant] actively deterred A.B. from telling Mother. As A.B. testified, "There were several times when I threatened to tell my mom and I would try to pull away from him and go get my mom, but he made it very clear that she wouldn't believe me." At one point, A.B. did attempt to tell Mother about the abuse, but when she told Mother that

3

[Applicant] was "watching naked people on the computer," Mother scolded A.B., telling her not to speak of it again and that, even if [Applicant] was doing such a thing, it was none of their business.

A.B. alleged at trial that both Stepfather and Mother had observed separate incidences of abuse. According to A.B., Stepfather saw [Applicant] touching her breasts beneath her shirt while they watched television and immediately told Mother about it, but Mother dismissed Stepfather's concerns, telling him that he must have been mistaken. When Mother questioned A.B. about Stepfather's concern, according to A.B., she lied and denied that it happened. Another time, according to A.B., Mother observed [Applicant] humping A.B. while she was bent over the couch, but said nothing until [Applicant] left the apartment, at which point she told A.B. not to allow someone to do that to her.

### B.   The abuse continued when Uncle and [Applicant] moved to their own apartment.

After about four months, in April 2008, Uncle and [Applicant] moved into a one-bedroom apartment within the same apartment complex, about a minute's walk from A.B.'s apartment. In the next four or five months, at Mother's urging, A.B. and her little brother, who was about three or four years old, visited [Applicant] at his apartment at least twice a week after school while Uncle was at work. During these visits, while her brother entertained himself with toys, [Applicant] continued his routine of touching A.B.'s genitals while she was sitting in his lap and forcing her to watch pornography, often explaining what was happening in the pornographic scenes. A.B. estimated that this happened approximately 25 times in Uncle and [Applicant]'s apartment. According to A.B., on three or four occasions, [Applicant] took her into the closet, turned out the lights, and pretended to be a police officer conducting a pat-down search over and under A.B.'s clothes.

Over time, [Applicant] grew even bolder. A.B. recounted an instance in which [Applicant] forced A.B. to lie down on a bed and, according to A.B., he laid on top of her and "practice[d] missionary" by humping her and moaning. Another time, [Applicant] lifted A.B.'s

shirt and put his mouth on her nipples. Finally,
[Applicant] attempted to have penetrative sex with A.B.
On that occasion, according to A.B., [Applicant] made
her bend over the bed, took her pants off, and "was
rubbing his penis onto [her] butt and he kept asking
[her] where [her] hole was." Still only 10 years old at
the time, A.B. did not understand. As she described to
the jury,

> And so I felt his penis on my butt because it
> was wet and he kept taking it in and out. And
> at one point during that instance I felt a
> really sharp pain in my vagina and at that
> point, like, I screamed and I told him it
> really hurt and he apologized. And he kept
> saying, like, I won't do it again, and then
> he just got up and he went to the bathroom
> and he showered.

**C.    [Applicant] continued to abuse A.B. once he moved
to an apartment across the hall from hers.**

Later in 2008, the rest of [Applicant]'s family
moved to Bedford from Pakistan, and they all moved into
a two-bedroom apartment directly across from A.B.'s
apartment. When A.B. visited [Applicant]'s new
apartment, he grabbed her by the wrist and informed her
it would be the last time they could "do anything"
because his family was moving in. According to A.B., he
kept hold of her wrist, refusing to let her leave the
apartment, but she finally managed to break free and
return to her own apartment.

Unfortunately, [Applicant]'s statement did not
prove to be true. On one occasion, when [Applicant]'s
apartment was full of family members attending a
traditional Friday-night dinner, [Applicant] approached
A.B. in a bedroom and told her, "We can do things here,
it's okay, no one will find out." When A.B. threatened
to scream so everyone could hear, according to A.B.,
[Applicant] did not appear to care. That evening, A.B.
managed to get outside of the bedroom and within sight
of Uncle, so [Applicant] was thwarted.

But, according to A.B., the abuse continued.
Whenever [Applicant] would drive her places, A.B.
testified, "he would shove his finger up [her] anus"
through her clothes. And A.B. recounted an instance

5

when she was 12 or 13 years old and [Applicant] "just started grabbing [her] butt" when they were in Walmart shopping for school supplies.

### D.   A.B. outcried to Mother and Stepsister, and they confronted [Applicant].

According to A.B., the abuse finally stopped when she was about 14. In the next year, when she was 15 and a high school sophomore, A.B. finally succeeded in telling her Mother about the abuse. Mother found A.B. sitting in her closet, upset and crying, and assumed that A.B. was upset that she had lost a tennis match. But instead, A.B. confessed that she was crying because her first boyfriend had recently broken up with her. Mother expressed that she was shocked and upset by this revelation because she had forbidden A.B. from dating until she was older. At that point, A.B. said she "snapped" and confronted Mother, accusing her of ignoring [Applicant]'s sexually abusive behavior over the years.

Mother testified at trial that A.B. told her that [Applicant] "touch[ed her] everywhere" when he was living with them and pointed to her breasts, between her legs, and her behind. She also said that A.B. told her about his inappropriate touching during the orange-ball game and his touching her bottom while they were shopping at Walmart.

Despite A.B.'s revelation, Mother did not immediately contact the police. Instead, she told Stepsister, who then telephoned A.B. Stepsister testified at trial that A.B. called her and told her about [Applicant]'s abuse. A.B. testified that she told Stepsister, in detail, what had happened and that Stepsister was the first person she told about the "penetration incident." The family still did not contact police, and they waited another week to confront [Applicant] so as not to disturb Stepbrother's wedding festivities.

A.B., Mother, and Stepsister testified that, after the wedding, Stepsister called [Applicant] and left a voicemail in which she said she knew what he had done to A.B. The women testified that, within minutes, [Applicant] returned her call and immediately started apologizing. Stepsister recalled [Applicant]'s pleas

6

for forgiveness and testified that he said, "I'm really sorry what I did. I know I did wrong and I'm asking forgiveness from God that he will forgive me. I know I did what I did, it was wrong and I shouldn't have done it."

[Applicant] also acknowledged his culpability on a second occasion. Stepfather testified at trial that once, when he and [Applicant] were finishing their prayers at the mosque, he asked [Applicant] what had happened. Stepfather recounted the conversation and [Applicant]'s pleas for forgiveness:

> [Applicant] said, I did five time, but he didn't mention what he do. That was his answer. And he said I prayed to Allah God forgive me what I did wrong or you can beat me. I said, no, I can't do this because . . . I can't take law in my hand to beat you up. And then he said, I consider her as a . . . sister.

Still, the family did not report [Applicant] to the police. Distressed over her family's lack of action and feeling as though she was being blamed for the abuse, A.B. began struggling at school and on her tennis team. In April 2014, she eventually confided in her tennis coach that she had been abused, and he directed her to the school counselor, Peggy McIntire. When McIntire met with Mother and A.B., she encouraged Mother to arrange counseling for A.B., which Mother agreed to do. But when school began again in the fall, McIntire met with A.B. and discovered that Mother never arranged for counseling. It was at that point that McIntire questioned A.B. about specifics related to the abuse and subsequently reported the abuse to the police.

Accompanied by Mother, A.B. met with Bedford Police Detective Pat Ripley on December 23, 2014. Detective Ripley described A.B. as appearing calm and very intelligent throughout their hour-long interview, and he perceived no indications that she had fabricated any of the allegations. As a result of Detective Ripley's investigation, [Applicant] was arrested, and in December 2015, he was charged with: (1) one count of continuous sexual abuse of a child by committing aggravated sexual assault by penetrating A.B.'s sexual

organ with his finger and/or his penis and indecency
with a child by contacting her sexual organ with his
hand; (2) one count of engaging in sexual contact by
touching A.B.'s genitals; and (3) one count of engaging
in sexual contact by touching A.B.'s breast.

## II. The trial

### A. Defense counsel's mistake during voir dire

The case proceeded to trial in late September
2016. During voir dire, Juror Number 8 confessed that
she would be "somewhat biased because [she] was
sexually molested when [she] was a child" and that her
"emotions might be more than . . . what [she] would be
able to help." When the trial court explained that the
case could be emotional "for a lot of people" and asked
whether she could follow the law despite any emotional
reaction she may have, Juror Number 8 responded that
she would "try to follow the law." Later, upon further
questioning by defense counsel, Juror Number 8
elaborated on her experiences, explaining that she was
molested by several family members and her mother,
siblings, and some of her nieces and nephews had also
been sexually abused. She told the trial court that the
experiences made her very emotional, but that she
"could listen and try [her] best to help." Upon further
questioning, Juror Number 8 stated, "I think I would
like to be on [the jury] and just so that I messed up,
can learn to grow beyond what happened." Defense
counsel challenged Juror Number 8 for cause but the
trial court denied his challenge.

From the record, it is apparent that defense
counsel intended to include Juror Number 8 in his list
of preemptory strikes, but he failed to do so. Once the
court named and seated the members of the jury, counsel
requested to approach the bench. In a bench conference,
defense counsel asserted that he had struck Juror
Number 8, to which the trial court replied that she was
not on the defense counsel's list of strikes. Defense
counsel admitted his mistake, stating on the record,
"That's crazy. I struck the wrong one." The trial
proceeded with Juror Number 8 sitting on the jury.

**B.   The evidence presented by [Applicant]**

In response to the above-described evidence of abuse that was presented by the State, [Applicant] testified on his own behalf and presented testimony by his brother, his sister, and his mother.

Through an interpreter, [Applicant] admitted that he and A.B. played the orange-ball game, but he denied doing so more than three to five times and claimed that any inappropriate touching occurred accidentally. He flatly denied A.B.'s other allegations of abuse. He also denied speaking about the allegations with Stepfather at the mosque or telling Stepfather that "[i]t happened five times." According to [Applicant], the first time he heard about the abuse accusations was when Stepsister called and left him a message that said, "Call me." He claimed that, when he called Stepsister back, she and Mother were crying and yelling at him, and, thinking that they were upset with him for playing the orange-ball game with A.B., he apologized once in respect of Stepsister and Mother. As to any requests for forgiveness from God, he explained that in his religion it is customary to ask for general forgiveness every time one prays, not necessarily for anything in particular.

[Applicant]'s mother, brother, and sister testified that they never observed A.B. and [Applicant] interacting in a manner that concerned them, but they also admitted that they did not join [Applicant] and Uncle until more than a year after [Applicant] and Uncle moved to the United States.

**C.   Conviction and sentencing hearing**

The jury found [Applicant] guilty of continuous sexual abuse. [Applicant] elected for the trial court to determine punishment, and the trial court sentenced [Applicant] to 35 years' confinement. After [Applicant]'s sentence was pronounced, defense counsel explained on the record that he had discussed [Applicant]'s options for appeal with [Applicant] and his family. Defense counsel represented that they had discussed "all the pros and cons" of his handling the appeal and [Applicant] trusted him and requested that he continue his representation and handle the appeal. Defense counsel, who had previously apprised

the trial court that he was a candidate for an elected
judicial office, claimed that, if elected, he could
still file [Applicant]'s brief before assuming the
bench, and he requested that the trial court allow him
to stay on the case. The trial court consented.

### D.   Postsentencing developments

On October 4, 2016, five days after the trial
court sentenced [Applicant], the State provided defense
counsel with a document entitled "State's Response to
Defendant's Motion for Discovery of Exculpatory and
Mitigating Evidence." The document described itself as
a notice served in accordance with *Brady v. Maryland*
and stated,

> That on or about September 30, 2016 at the
> Tarrant County District Attorney's Office,
> [Stepfather] told Assistant Criminal District
> [Attorneys] Matt Smid and Brook Panuthos that
> the Defendant is "probably 75 percent
> innocent." He said that he is basing this
> opinion on what he did not see. He also said
> that his brother, [Uncle], never saw anything
> suspicious happen between [A.B.] and
> Defendant either. [Stepfather] then asked
> what he could do to 'undo' the sentence. He
> also asked if he could bond [Applicant] out.

In November, after [Applicant]'s trial counsel was
elected to the judicial position he sought, the trial
court appointed new appellate counsel.

(Mem. Op. 2-13, doc. 23-14 (footnotes and citations omitted).)

## II. ISSUES

In three grounds for habeas relief, applicant claims that he

received ineffective assistance of trial and state habeas counsel

(grounds one and two) and that his right to due process was

violated by the state appellate court (ground three). (Pet. 7,

doc. 1; Pet'r's Mem. 24, doc. 8.)

10

### III.   RULE 5 STATEMENT

Respondent believes that applicant's claims, as construed by him, have been exhausted in state court and that the petition is not otherwise subject to the successive-petition bar or untimely. (Resp't's Answer 11, doc. 21.)

### IV. LEGAL STANDARD FOR GRANTING HABEAS CORPUS RELIEF

A § 2254 habeas petition is governed by the heightened standard of review provided for in the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as established by the United States Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. 28 U.S.C. § 2254(d)(1)-(2); *Harrington v. Richter,* 562 U.S. 86, 100 (2011). This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Richter*, 562 U.S. at 102.

The statute further requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. It is the applicant's burden to

11

rebut this presumption by clear and convincing evidence. *Id.*

Further, when the most recent state court to consider a constitutional issue provides a "reasoned opinion," a federal habeas corpus court must "review[ ] the specific reasons given by the state court and defer[ ] to those reasons if they are reasonable." *Wilson v. Sellers,* --- U.S. ---, 138 S. Ct. 1188, 1191-92 (2018). Under those circumstances, a federal court should "'look through' the unexplained decision to the last related state-court decision providing" particular reasons, both legal and factual, "presume that the unexplained decision adopted the same reasoning," and give appropriate deference to that decision. *Id.*

## V. DISCUSSION

### A. Ineffective Assistance of Trial and State Habeas Counsel

Under his first ground, applicant claims that his trial counsel, Richard Scott Walker,[3] was ineffective by not exercising a peremptory challenge against Juror Number 8 who indicated that she was "somewhat biased" because she was sexually molested as a child and that her "emotions might be more than what -- what [she] would be able to help." (Reporter's R., vol. 2, 27, doc. 23-5.) In response to additional questioning by the prosecutor, Matthew Smid, she stated that she would nevertheless "try to

---

[3]Trial counsel was elected to the Texas Court of Criminal Appeals in November of 2016.

12

follow the law." (Id. at 28.) Also, during Walker's questioning,

the following colloquy occurred:

>       [MR. WALKER]: Okay. Let's go to my next question.
> Juror number 8, Ms. Perez, where are you? Did you say
> that you were sexually molested as a child?

>       [MS. PEREZ]: Yes.

>       [MR. WALKER]: Is that correct? So I'm going to ask
> you the same thing, same question. Can you stand up,
> please? I'm sorry. And I know it's traumatic. So do you
> have a bias in a sexual assault case? And we just want
> the truthful honest answer.

>       [MS. PEREZ]: Being that it happened to me so long
> ago, I think that I would be able to help.

>       [MR. WALKER]: Okay. All right. Let me word it this
> way. What I need to know is this. Since you have been
> the victim of a sexual assault, are you going to be
> more apt to find someone guilty than you would be if
> you hadn't been the victim of sexual assault yourself?

>       [MS. PEREZ]: I think because, like I said before,
> because being so long ago and knowing more myself about
> all the implications, I think that I would -- I would
> be more apt to listen and not try to convict a person
> right away.

>       [MR. WALKER]: Okay. So since you just said what
> you said, you know, this has already been mentioned
> before and I'll ask it this way, as you stand here
> right now, when you haven't heard any evidence, and you
> had to be asked what would be the verdict right now as
> we stand here, what would it be in your mind?

>       [MS. PEREZ]: I believe everybody is entitled to a
> fair trial.

>       [MR. WALKER]: Okay. So do you think –

>       [MS. PEREZ]: Everybody is not guilty, not until
> proven guilty.

[MR. WALKER]: Okay. That's all I need. You may sit down.

(Reporter's R., vol. 2, 98-99, doc. 23-5.)

Finally, during in camera questioning before the court and attorneys, the following colloquy occurred:

THE COURT: Initially you said you wanted to talk about some things at the bench. When everyone was asking you questions you did reveal that you had been a victim of sexual assault and that you believe that you could be fair in this trial. I just wanted to make sure, was there anything else that you needed to share outside the presence of the rest of the jurors?

MS. PEREZ: The only thing is, as far as me, I was molested by several members of my family, and my mother was raped twice. My older sister was also raped, and due to that fact she had an abortion. My younger siblings were also molested and so were a few of my nieces and nephews.

THE COURT: Okay. So you've had a lot of family situations that are similar to the nature of the charge today. Knowing all of that, do you think that you could sit and listen to the testimony in this case and base your decision solely on the evidence that you hear here, or do you think that because of your personal experiences you might have a bias one way or the other?

MS. PEREZ: I don't know how would I be able to express what exactly I'm feeling. You know, I get very emotional. A lot of times it could be a whisper, a sound, just anything could manifest, you know. I mean, just be at home by myself and I'll be crying thinking, you know, why did it happen to us.

THE COURT: And you -- I can see that just talking about this has made you emotional in here. So my question would be, do you think that because of that experience, the emotions of what you have experienced, would you be able to listen to the testimony, or do you think you'd be better suited for a different case?

MS. PEREZ: I have been trying to pay attention to what is going on. And I can't say that I won't be --

14

maybe get emotional, but I think that I could listen
and try my best to help.

THE COURT: And this is the last question and I'm
going to let you decide. When you're saying help, I
appreciate you wanting to try to do this. But really
what we need to know is can you follow the law and if
the State fails to prove their case beyond a reasonable
doubt, would you be able to find the Defendant not
guilty? Knowing what you know, about the emotions that
you have about this type of case, would you hold the
State to the burden of proving their case beyond a
reasonable doubt and separating the emotion from that?
And whatever the answer is is fine. You have helped
just by being here today. But I just want to make sure
that you don't get -- and we have to know before you
get into the jury box whether or not you will be able
to separate what happened from this trial today.

MS. PEREZ: Without -- without seeing the actual
evidence or really knowing the actual case, I think
that I can.

THE COURT: Okay. Mr. Smid, did you have any
questions?

MR. SMID: No, ma'am.

THE COURT: Mr. Walker, did you have any questions?

MR. WALKER: I do. Let me ask you a question this
way. You mentioned that, you know, many people in your
family have been molested or sexually assaulted,
correct?

MS. PEREZ: Yes.

MR. WALKER: Okay. So when you're sitting in the
jury, if you are, for two or three days listening to
testimony about child sexual assault case, are you
going to be able to give this case your undivided
attention without having flashbacks about all these
things that happened to you and your family?

MS. PEREZ: When I was listening to what you were
talking about, finding a person guilty beyond benefit
of the doubt, it's making me go back, like not actual
flashback but thinking a lot of it was because we were

so little and because of being family that the fact
that it was family members and how we were as -- you
know, being children, we were being -- like one of the
ladies was saying that it was as though they were
keeping an eye on us to see who was the one that was
more quiet. And I believe that was my case. I was the
one that was always quiet. I never said anything.

MR. WALKER: Okay. And so the question - try as
simple as I can ask it is, can you give the testimony
in the case your undivided attention, or on the other
hand -- and it's okay if this is the truth, are you
going to be going back and thinking about what happened
to you and your family members while the case is going
on and maybe missing the testimony?

MS. PEREZ: Again, because I have not heard the
actual fact, I can't say that I won't.

MR. WALKER: That you won't what?

MS. PEREZ: That I won't try to see the differences
or may not be able to fully understand.

MR. WALKER: Okay. What if you found out in this
case you start hearing that this case is about family
members and family members, is that going to really hit
a nerve with you that causes you to really start
concentrating on what's been going -- what happened to
you and your family and not be able to give this case a
fair -- you know, listen and really pay attention to
everything that's going on and then come up with a fair
verdict? If it's a problem for you and you can't do it
just say, I can't do it.

MS. PEREZ: I think I would like to be on it and
just so that I messed up, can learn to grow beyond what
happened.

THE COURT: Okay. Thank you, Ms. Perez. You may
step out in the hall and you can have a break until
4:30.

(Prospective juror number 8 exists courtroom)

MR. WALKER: I would challenge her.

MR. SMID: Just don't think she's there yet, Your

16

Honor. I respect the Court ruling.

THE COURT: Denied.

MR. WALKER: One thing that she said at the very end, she wants to be on this case.

THE COURT: Doesn't make her challengeable. That's denied.

MR. WALKER: Okay.

(Id. at 136-41.)

Trial counsel admitted that he intended to use a peremptory strike on the juror but mistakenly used it on the wrong juror. (Id. at 153.)

Applicant raised this claim on state habeas review where he was represented by court-appointed counsel. (SHR 180, doc. 23-24.) Trial counsel responded to the allegation in an affidavit that although it was true that he intended to strike Juror Number 8 and failed to do so, he "did not believe the result of the trial would have been any different if he had struck her" given A.B.'s testimony and the fact that "she was a very good witness for the State and came across as very believeable." (Id. at 167.)

A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. CONST. amend. VI, XIV; *Evitts v. Lucey*, 469 U.S. 387, 393-95 (1985); *Strickland v. Washington*, 466 U.S. 668, 688 (1984); *Anders v. California*, 386 U.S. 738, 744 (1967). To establish ineffective assistance of counsel, a applicant must show (1) that counsel's performance

17

fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688. In applying this test, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id.* at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689.

Ineffective-assistance-of-counsel claims are considered mixed questions of law and fact and, therefore, are analyzed under the "unreasonable application" standard of § 2254(d)(1). *See Gregory v. Thaler,* 601 F.3d 347, 351 (5th Cir. 2010). Where the state courts have adjudicated the ineffective-assistance claim on the merits, this court must review applicant's claim under the "doubly deferential" standards of both *Strickland* and § 2254(d). *Cullen v. Pinholster,* 563 U.S. 170, 190 (2011). In such cases, the "pivotal question" for this court is not "whether defense counsel's performance fell below *Strickland*'s standard"; it is "whether the state court's application of the *Strickland* standard was unreasonable." *Richter,* 562 U.S. at 101. *See also id.* at 105 (providing "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and §

18

2254(d) are both 'highly deferential,' and when the two apply in
tandem, review is 'doubly' so." (internal quotation marks and
citations omitted)).

Based upon the documentary evidence and trial counsel's
affidavit, the state habeas judge adopted the magistrate's
factual findings and conclusions of law.[4]  The findings on the
ground related to Juror Number Eight included the following:

40. During voir dire, Juror Number Eight confessed
that she would be "somewhat biased because [she]
was sexually molested when [she] was a child" and
that her "emotions might be more than . . . what
[she] would be able to help."

41. Despite this, Juror Number Eight said that she
would "try to follow the law."

42. Later, Juror Number Eight elaborated about her
experiences and indicated that although those
experiences made her emotional, she "could listen
and try [her] best to help."

43. Upon further questioning, Juror Number Eight
stated, "I think I would like to be on [the jury]
and just so that I messed up, can learn to grow
beyond what happened."

44. Walker challenged Juror Number Eight for cause,
but the Court denied his challenge.

45. Walker intended to use a preemptory strike on
Juror Number Eight, but he mistakenly left her off
his preemptory strike list.

---

[4]As has become the practice in Tarrant County, Texas, applicant's state
court habeas application was assigned to a magistrate to prepare and enter
findings of fact and conclusions of law. (Clerk's R. 149, doc. 23-24.)
Consistent with the Tarrant County practice, the prosecutor filed proposed
findings of fact and conclusions of law. (Id. at 236-265.)  And, the
magistrate adopted the prosecutor's proposed findings of facts and conclusions
of law. (Id. at 274.)  Those same findings and conclusions were later adopted
by the Texas Court of Criminal Appeals. (SHR Jan. 8, 2020 Order, doc. 23-23.)

46.   The trial proceeded with Juror Number Eight
      sitting as a juror.

47.   Walker was certain, however, that the court of
      appeals would not reverse [applicant]'s conviction
      based on Juror Number Eight's presence on the jury
      because: (1) the juror was not challengeable for
      cause; and (2) [A.B.]'s testimony was strong.

48.   [Applicant] does not explain how the result of his
      trial would have been different had . . . Walker
      used a preemptory challenge on Juror Number Eight.

49.   [Applicant]'s claim is conclusory and not
      supported by specific facts showing he is entitled
      to relief.

(Clerk's R. 242-43, doc. 23-24.)

The conclusions ultimately adopted by the Texas Court of

Criminal Appeals included the following:

2.    A writ application must allege specific facts so
      that anyone reading the writ application would
      understand precisely the factual basis for the
      legal claim. *Ex parte Medina*, 361 S.W.3d 633, 641
      (Tex. Crim. App. 2011).

3.    Relief may be denied if the applicant states only
      conclusions and not specific facts. *Ex parte
      McPherson*, 32 S.W.3d 860, 861 (Tex. Crim. App.
      2000).

4.    To prevail on a claim of ineffective assistance of
      counsel, a defendant must show (1) that his
      attorney's performance was deficient and (2) that
      his defense was prejudiced. *Strickland v.
      Washington*, 466 U.S. 668, 687 (1984).

(*Id.* at 245.)

      . . . .

6.    To demonstrate prejudice from an attorney's
      deficient performance, the defendant must show a
      reasonable probability that the jury's decision

would have been different absent counsel's errors. *Strickland*, 466 U.S. at 694.

7.  An applicant bears the burden of proving by a preponderance of the evidence that his counsel was ineffective. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

8.  Regarding Applicant's claim of ineffective assistance of counsel for failing to strike Juror Number Eight, assuming this error constituted deficient performance, Applicant has failed to show there is a reasonable probability that the jury's decision would have been different if Juror Number Eight had been struck.

9.  Regarding the remainder of Applicant's claims of ineffective assistance of counsel, they are merely conclusory; they do not allege specific facts showing that . . . Walker's performance was deficient, and they do not show that any errors prejudiced Applicant.

(*Id.* at 246.)

. . . .

1.  Applicant does not explain how the result of his trial would have been different had . . . Walker used a preemptory challenge on Juror Number Eight.

2.  Applicant's claim that . . . Walker was ineffective for not using a preemptory challenge on Juror Number Eight is conclusory and not supported by specific facts showing he is entitled to relief.

(*Id.* at 249.)

Based on the foregoing findings, and applying the *Strickland* standard, the state habeas court concluded that, assuming that Walker's error constituted deficient performance, the claim was conclusory and applicant failed to show a reasonable probability that the jury's decision would have been different had the juror

been struck. (*Id.* at 246, 251, 280.) Petitioner presents no clear and convincing evidence in rebuttal. To the contrary, Walker affirmatively stated that he is certain that the presence on the jury of Juror Number Eight did not cause the outcome of the trial to be any different from what it otherwise would have been.[5] (*Id.* at 243.) Thus this court must defer to the state court's factual findings on the issue. 28 U.S.C. § 2254(e)(1). Applying the appropriate deference, the state court's decision is not an unreasonable application of *Strickland*.

A juror is biased if the "juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Soria v. Johnson,* 207 F.3d 232, 242 (5th Cir. 2000). If a juror is not biased, counsel's failure to challenge that juror does not support a claim for ineffective assistance of counsel. *Virgil v. Dretke,* 446 F.3d 598, 608-09 (5th Cir. 2006). In this case, the juror did not express an actual bias against applicant based on her alleged personal and family history of sexual abuse nor did applicant demonstrate that bias should be presumed. He asserts that there is a "clear inference" that the juror was biased as a result of

---

[5]Walker emphasized in his state habeas affidavit that he was of the opinion that the victim was a very believable witness, explaining as follows:
>However, the victim was twenty years old at the time of trial, was very articulate, appeared to be intelligent, and appeared to be very angry about her belief that her family wanted her to keep quiet about the abuse. In short, she was a very good witness for the State and came across as very believable.

Clerk's R. 166, doc. 23-24.

her alleged personal and family history of sexual abuse, however courts are extremely hesitant to impute bias to jurors and the Fifth Circuit has expressed some doubt about the viability of the implied-bias doctrine. (Pet'r's Mem. 29, doc. 8.) *See Buckner v. Davis,* 945 F.3d 906, 912-15 (5th Cir. 2019); *Solis v. Cockrell,* 342 F.3d 392, 396-99 (5th Cir. 2003) (summarizing Fifth Circuit implied-bias law). In this case, the juror disclosed that she and other family members had previously been victims of sexual abuse, in entirely unrelated cases, and there is no indication that she was otherwise so emotionally involved in applicant's case such that her impartiality was affected. Further, the follow-up questions directed toward rehabilitating the juror and obtaining assurances of impartiality were sufficient to root out bias based on her experience. The state court's findings and conclusions embrace an implied finding that any bias the juror might have initially had did not enter into the outcome of the case. (Clerk's R. 246, doc. 23-24.)

Under his second ground, applicant claims that his state habeas counsel was ineffective by failing to properly present and argue his ineffective-assistance-of-trial-counsel claim under ground one in addition to the following ineffective-assistance-of-trial-counsel claims, the first two of which were raised in

state habeas counsel's supplement to applicant's pro se state

habeas application:

> (1)   trial counsel was ineffective by permitting
>       witnesses to testify to their opinion that the
>       child's outcry was true;
> (2)   trial counsel was ineffective by failing to secure
>       a qualified interpreter; and
> (3)   trial counsel was ineffective by failing to object
>       to a fatal variance between the indictment and the
>       evidence at trial.

(Pet'r's Mem. 33-38, doc. 8; Pet'r's Reply 4-5, doc. 29; SHR 216,

218, doc. 23-24.)

In addition to the findings and legal conclusions entered by

the state habeas court as to ground one, the court adopted and

entered the following findings and conclusions as to the first

two claims:

### Opinion on Truthfulness of Outcry

> 3.   Applicant does not explain how . . . Walker's
>      performance was deficient for failing to object to
>      this testimony.
>
> 4.   Applicant does not explain the legal basis for his
>      claim.
>
> 5.   Applicant does not explain how the result of his
>      trial would have been different had . . . Walker
>      objected to this testimony.
>
> 6.   Applicant's claim that . . . Walker was
>      ineffective for not objecting to this testimony is
>      conclusory and not supported by specific facts
>      showing he is entitled to relief.

### Failure to Secure Qualified Interpreter

> 7.   Applicant does not explain how the interpreter in
>      this case was not qualified—he only states that he
>      was not a certified interpreter.

24

8.   Applicant has not shown that an interpreter must
     be certified to be a qualified interpreter.

9.   Additionally, Applicant has not alleged any
     specific inaccuracies in the interpreter's
     translations.

10.  Applicant does not explain how the result of his
     trial would have been different had he had another
     interpreter.

11.  Applicant's claim that . . . Walker was
     ineffective for not securing a qualified
     interpreter is conclusory and not supported by
     specific facts showing he is entitled to relief.

(SHR 249-50.)

Based on those findings, and applying the *Strickland*

standard, the state habeas court concluded that the claims were

conclusory because they did not "allege specific facts" showing

deficient performance or prejudice. (Id. at 250-51.) Petitioner

presents no clear and convincing evidence in rebuttal, thus this

court must defer to the state court's factual findings on the

issues. 28 U.S.C. § 2254(e)(1). Applying the appropriate

deference, the state court's decision is not an unreasonable

application of *Strickland*.

Applicant appears cognizant that there is no federal

constitutional right to effective assistance of counsel in post-

conviction habeas proceedings, however, relying on the

*Martinez/Trevino* line of cases, he argues that the ineffective-

assistance-of-trial-counsel claims raised by state habeas counsel

are "substantial" but were effectively defaulted because state

habeas counsel did not present and argue the claims properly.
Thus, he asserts that the claims should be considered by this
court based upon "new facts and law previously not seen in the
state court due to counsel (habeas) ineffectiveness." (Pet'r's
Mem. 33-38, doc. 8; Pet'r's Reply 5, doc. 29.) *See Trevino v.
Thaler,* 569 U.S. 413, 429 (2013); *Martinez v. Ryan,* 566 U.S. 1,
8-9 (2012). However, state habeas counsel did not procedurally
default the claims—*i.e.,* the claims were not defaulted due to a
procedural bar foreclosing review of the claims. (SHR 216, 218,
220-21, doc. 23-24.) The *Martinez/Trevino* line of cases does not
apply to claims that were fully adjudicated on the merits by the
state habeas court because those claims are, by definition, not
procedurally defaulted. *Escamilla v. Stephens,* 749 F.3d 380, 390
(5th Cir. 2014). And, to the extent petitioner asserts that the
court should consider "new facts and law," § 2254 limits a
federal court's review to the record that was before the state
court. *See Cullen v. Pinholster,* 563 U.S. 170, 181-82 (2011).

Further, even assuming the claims were procedurally
defaulted in state court and that state habeas counsel's
omissions constitute deficient performance, applicant fails to
establish by clear and convincing evidence or persuasive legal
argument that the claims have "some merit." *Martinez,* 566 U.S. at
14. To establish ineffective assistance of state habeas counsel,
applicant must show both that habeas counsel's performance—in

failing to present to the state habeas court alleged "new facts and law" he presents for the first time in federal court—was deficient and that he was prejudiced by the deficient performance—that is, that there is a reasonable probability that he would have been granted state habeas relief had the evidence been presented in the state habeas proceedings. *Strickland,* 466 U.S. at 668, 687; *Newbury v. Stephens,* 756 F.3dc 850, 872 (5th Cir. 2014). Petitioner presents no "new facts" or legal argument sufficient to establish that he would have been granted state habeas relief had those "new facts" or legal argument been raised by state habeas counsel.

Nor does the remaining claim that trial counsel was ineffective by failing to object to a fatal variance between the indictment and the evidence at trial, raised independently for the first time in this federal petition, have merit. Applicant claims that "the indictment alleged that the abuse began in 2006-2010 and the evidence at trial alleged that the abused alleged to have been 2007-2010" and that he was not in America in 2006. (Pet'r's Mem. 38, doc. 8.)

> The indictment alleged that applicant
>
> *on or about* the 31st day of December 2010, and before the presentment of this indictment . . . did 11th day of August, 2006 through the 10th day of August, 2010, did intentionally or knowingly, during a period of time that is 30 days or more in duration, commit two or more acts of sexual abuse . . . .

(SHR 5, doc. 23-24 (emphasis added).)

There is no fatal variance between the dates alleged in the
indictment and proved at trial because the state is not required
to prove the specific dates alleged in the indictment. *See Sledge
v. State,* 953 S.W.2d 253, 255 (Tex. Crim. App. 1997) (en banc).
The Texas Court of Criminal Appeals has determined that unless
time is a material element of an offense, an indictment is not
required to specify the precise date when a charged offense
occurred, nor a window of time within which the offense must have
occurred, in order to satisfy constitutional notice requirements.
*See* Tex. Pen. Code Ann. § 1.07(a)(22)(West Supp. 2014); *Garcia v.
State,* 981 S.W.2d 683, 685–86 (Tex. Crim. App. 1998). Instead,
the "on or about" language of an indictment allows the state to
prove a date other than the one alleged in the indictment as long
as the date is anterior to the presentment of the indictment and
within the statutory limitation period. *Id.* at 256. The evidence
at adduced at applicant's trial was sufficient to prove that he,
during a period of time that is 30 days or more in duration,
committed two or more acts of sexual abuse within the time frame
contained in the indictment and on dates anterior to the
presentment of the indictment and within the statutory period of
limitations for the offense.

**B. Due Process Violation**

Under his third and final ground, applicant claims

[w]here [he] showed a plausible claim for IAC based in
the record during the voir dire phase of the trial, his

right to Due Process pursuant to the 5th and 14th
Amendments to the United States Constitution was
violated when the [state] court of appeals employed the
presumption that [trial counsel] "considered and
rejected" a motion for new trial in order to deny him
the relief he requested—An abatement and Out-of-Time
Motion for New Trial. The state court's decision was
unreasonable, contrary &/or inconsistent with Supreme
Court Decisions & 5th,14th Amendment.

(Pet. 7, doc. 1.)

A criminal defendant has a constitutional right to the
assistance of counsel on a motion for new trial during the
post-trial, pre-appeal period, which is a critical stage of
proceedings. U.S. CONST. amend. VI; *McAfee v. Thaler,* 630 F.3d
383, 383 (5th Cir. 2011). Under Texas law, there is a rebuttable
presumption that where, as here, a defendant is represented by
appointed counsel during the 30-day period following sentencing
that counsel continued to adequately represent the defendant
during this post-conviction stage and considered and rejected the
possibility of filing a motion for new trial when one is not
filed inside the 30-day deadline. *Oldham v. State,* 977 S.W.2d
354, 363 (Tex. Crim. App. 1998); *Smith v. State,* 17 S.W.3d 660,
663 (Tex. Crim. App. 2000). Applicant claims that his right to
due process was violated by the court of appeals's application of
this presumption to his ineffective-assistance-of-counsel claims
on appeal. (Mem. Op. 13-20, doc. 23-14.) Although applicant
raised this claim in his petition for discretionary review, the
Texas Court of Criminal Appeals refused the petition without

29

explanation. Thus, the court assumes that the state court's denial was a denial on the merits. *See Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000).

Initially, it is noted that applicant fails to explain how the presumption is "unreasonable, contrary &/or inconsistent with Supreme Court Decisions & 5th, 14th Amendment" or cite to any clearly established federal law in support of his claim, and none is found. Further, the presumption at issue is rebuttable and affords an opportunity to establish that counsel did not consider and/or reject the possibility of filing a motion for new trial when one is not filed. Nevertheless, applicant fails to present a claim trial counsel may have argued, which would have entitled him to a new trial. *Griffith v. State,* 507 S.W.3d 720, 722 (Tex. Crim. App. 2016). And, there is nothing in the record to suggest that counsel did not discuss the merits of a motion for new trial with applicant, which applicant rejected. Instead, there is some evidence that applicant was adequately represented by counsel and informed by counsel of his post-judgment rights. Counsel stated in his affidavit that he

> talked to [applicant] and several of his family members
> after receiving the Brady notice which appeared to be a
> partial recantation of his Uncle's trial testimony. I
> considered a possible motion for new trial based on the
> Brady notice, the problem with juror number eight, and
> the failure of the Court to provide a qualified
> interpreter in trial. I did post trial research on the
> issues, and communicated the results of my research
> with [applicant]. It was my opinion that a new trial
> would not be granted, and that there was nothing that

30

could have been developed at a hearing that would bring
about a positive result on direct appeal. The only
issue that I thought would be a possible winning
argument on appeal was the failure of the Court to
provide a competent interpreter, and I believed I had
preserved a record in trial that would not be enhanced
by having a new trial hearing. Based on Juror Number
eight's answers during my efforts to challenge her for
cause and the strength of the victim's testimony, I was
certain that the appellate courts would not reverse the
conviction based on her being on the jury. It is true
that I intended to strike her and failed to do so.
However, I do not believe the result of the trial would
have been any different if I had struck her. As to the
Brady notice, I do not believe the uncle's change of
heart and partial recantation would have made any
difference if we had a new trial hearing. The notice
did not do anything to prove that [applicant] was not
guilty, only that the uncle, after [applicant] was
convicted and sentenced, was of the belief that
[applicant] was only 25% guilty. The Brady notice was a
far cry from being a credible recantation by the
victim. It was my opinion then and my opinion now that
the uncle's change of heart would have no effect on any
post conviction review. . . . I did not abandon his
case at any time between the trial and my election to
the Court of Criminal Appeals. I perfected his appeal,
performed extensive research as to possible new trial
and/or appellate issues, and met with [applicant] and
several of his family members to discuss the post
conviction possibilities.

(SHR 166-67.)

Order

For the reasons discussed,

The court ORDERS the petition of applicant for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254 be, and is hereby,

denied. The court further ORDERS that a certificate of

appealability be, and is hereby, denied, as applicant has not

made a substantial showing of the denial of a constitutional
right.

     SIGNED December 14, 2020.

JOHN McBRYDE
UNITED STATES DISTRICT JUDGE